

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-20-2005

# Liong v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-3145

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Liong v. Atty Gen USA" (2005). *2005 Decisions.* Paper 805.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/805

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-3145

———

LINDAWATI SUYONO LIONG; FENNY SUTANO,

Petitioners

v.

\* ALBERTO R. GONZALES, Attorney General of the United States,

Respondent

\* Substituted pursuant to Rule 43(c), F.R.A.P.

———

On Petition for Review from the United States Department of Justice
Board of Immigration Appeals
(BIA No. A97-331-442/443)

Submitted pursuant to Third Circuit L.A.R. 34.1(a)
on July 15, 2005

———

Before: ALITO, VAN ANTWERPEN, and ALDISERT,
Circuit Judges.

(Filed July 20, 2005)

_____

OPINION OF THE COURT

———

VAN ANTWERPEN, Circuit Judge.

Petitioners Lindawati Liong and Fenny Sutanto, mother and daughter, are both ethnic Chinese natives and citizens of Indonesia. They seek review of a final order of the Board of Immigration Appeals ("BIA") dated June 30, 2004, summarily affirming the decision of the Immigration Judge ("IJ") denying them asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). For the reasons that follow, we will deny their petition.

I.

Petitioners entered the United States on July 5, 2000, with authorization to remain no later than January 4, 2001. The former Immigration and Naturalization Service ("INS")[1] placed Petitioners in removal proceedings on August 15, 2001, when it served Notices to Appear charging them with removability for remaining in the United States longer than permitted in violation of § 237(a)(1)(B) of the INA, 8 U.S.C. § 1227(a)(1)(B). Petitioner Liong submitted, on behalf of herself and her daughter, an application for asylum, withholding of removal, and relief under the CAT. At an initial hearing before the IJ, Petitioners admitted the factual allegations stated in the Notices to Appear, conceded removability, and indicated their desire to seek asylum, withholding of removal, and CAT protection. At the conclusion of Petitioners' merits hearing, the IJ denied Petitioners' applications, finding they had not sustained their burden of proof, and granted voluntary

---

[1] On March 1, 2003, the INS ceased to exist as an agency within the Department of Justice and the INS's functions were transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub.L. No. 107-296 §§ 441 & 471, 116 Stat. 2135.

2

departure.  The  BIA affirmed the IJ's decision *per curiam*.  This petition followed.

## II.

Petitioners' applications for asylum to obtain relief from the alleged persecution they faced in their native Indonesia are grounded in their claimed ethnic Chinese minority status as well as their claimed Catholic minority status.  The  testimonial and documentary support for their applications may be summarized as follows.  As to Ms. Liong, she testified that, as a youth, she had lost the opportunity to attend a Chinese school when the Indonesian government shut it down in either 1963 or 1964.  She testified to her belief that this occurred to prevent native Chinese Indonesians from learning Chinese.  At this school and at subsequent schools she attended, Ms. Liong testified, native Indonesian children would harass her by touching her body.  Ms. Liong also testified, without specific reference to time, that native Indonesians would throw stones at her family's house, and that local police did nothing in response unless they were offered payments.  Additionally, Ms. Liong testified that she had been forced to pay higher fees than native Indonesians for official papers such as those necessary to apply for citizenship, and that her husband, who remained in Indonesia, had upon several occasions been robbed in his car or at his store.  Ms. Liong described the robbers as gangs.  Finally, as to her status as a Catholic minority, Ms. Liong testified that she feared going to church because of bomb threats and because of individuals throwing stones.  With respect to her Catholicism, Mrs. Liong did not testify to any specific incidents directed against her personally.

As to Ms. Sutanto, both Ms. Liong and Ms. Sutanto testified that, as a child, Ms. Sutanto was repeatedly touched and harassed by native Indonesians. In one instance, they both testified, four native Indonesians threw sand and garbage at Ms. Sutanto when she was eight years old. Ms. Sutanto also testified that once, on her way to school, she had been robbed by native Indonesians. She testified that her ethnic Chinese friends had also been robbed by native Indonesians.

With respect to the riots that occurred in Indonesian cities in 1998, both Ms. Liong and Ms. Sutanto testified that they were only affected in one circumstance. While taking public transportation, a particular transfer caused them to be in a van transporting only native Indonesians. Both Petitioners testified that the driver of the van stopped the vehicle and ordered Ms. Liong and her daughter to turn over all jewelry and items of value. Petitioners complied. Both Ms. Liong and her daughter testified to being fearful of their physical safety during this incident.

In addition to the above testimony about their situations arising out of their ethnic Chinese minority status and their Catholic minority status, Petitioners also testified to their reasons for wanting to leave Indonesia for the United States. Here, Ms. Liong testified that she wanted to leave Indonesia because the social climate was becoming chaotic, the economy was failing, and she feared her daughter would be raped. She testified that she came to the United States with the intent of enrolling her daughter in college. She testified that she wanted her daughter to live in the United States for security reasons. Ms. Sutanto testified

4

that she did not feel secure living in Indonesia, that she feared returning to Indonesia, and that her father had warned her not to return.

Petitioners also offered documentary evidence. This consisted of a letter from the St. Thomas Aquinas Rectory in Philadelphia stating that Ms. Liong was a member of that church. Upon objection to the document by the government on authentication grounds, Ms. Liong testified that she had not known that she could, or should, ask a witness from the Rectory to testify. Ms. Liong also submitted two baptism certificates, one for herself and one for her daughter. The IJ reviewed them, then stated for the record that they would be given no weight because Ms. Sutanto's certificate suffered from obvious white-out alterations involving different typewriter print fonts as to her date of baptism.

III.

Because the BIA did not issue a separate order but merely adopted the opinion of the IJ, we must review the decision of the IJ. *Abdulai v. Ashcroft*, 239 F.3d 542, 549 n. 2 (3d Cir. 2001). We have jurisdiction to review the Board's final order of removal pursuant to INA § 242(a)(1), 8 U.S.C. § 1252(a)(1). We review to determine whether substantial evidence exists to support the agency decision. Under this highly deferential standard of review, the findings of the BIA or an IJ "must be upheld unless the evidence not only supports a contrary conclusion, but compels it." *Abdille v. Ashcroft*, 242 F.3d 477, 483-84 (3d Cir. 2001) (citing *INS v. Elias-Zacarias*, 502 U.S. 478, 481 & n. 1 (1992)).

To establish an asylum claim under INA § 208(a), 8 U.S.C. § 1158(a), a petitioner

5

must show that he or she qualifies as a refugee. A "refugee" is defined as an individual who is outside of his country of nationality and "unable or unwilling to return to . . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Petitioners had the burden of supporting their asylum claim through credible evidence. *Abdille*, 242 F.3d at 482. Because the standard for asylum is lower than the standard for withholding of removal, if Petitioners cannot meet the substantial evidence standard as to their asylum claim, relief under their withholding of removal claim must also fail. *See Abdulrahman v. Ashcroft*, 330 F.3d 587, 591 n. 2 (3d Cir. 2003) (citing 8 C.F.R. § 208.16(c)(2) & (4)). Petitioner's claim for relief under the CAT fails for similar reasons, as the CAT only applies to torture that "is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1).

Here, the IJ found that Petitioners' testimony regarding the alleged persecution they faced arising from both their native Chinese minority status and their Catholic minority status was insufficient to carry their burden of proof. Our review of the record confirms that substantial evidence supports this determination. The incidents that Petitioners have testified to do not amount to persecution, which we have held to mean "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom") but ("does not encompass all treatment that our society regards as unfair, unjust, or even

6

unlawful or unconstitutional"). *Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993).

Furthermore, even if Petitioners' testimony had articulated attacks rising to a level sufficient to be considered persecution, the necessary nexus to government action or inaction is absent here. Petitioners have recounted only incidents perpetrated by other Indonesians with, at most, a peripheral government nexus. This is insufficient to meet Petitioners' burden of proof, because the concept of "persecution" necessarily involves either government involvement or the involvement of individuals that the government is "unable or unwilling" to control. *See Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002). Here, there is no such evidence, and Petitioners' testimony that police officers were unwilling to respond when native Indonesians threw rocks at Petitioners' house is not enough under the substantial evidence standard of review to compel us to reach a conclusion different from that of the IJ and BIA below. Similarly, there is no evidence in the record of persecution arising from Petitioners' Catholic minority status; and even if there was, Petitioners have failed to show that any such mistreatment was attributable to either direct government involvement or the government's inability to control native Indonesians in relation to Petitioners' religious status.

Finally, we observe that the government introduced into the record in this case a March 2002 Report on Human Rights Practices issued by the United States Department of State. In the Report, the State Department indicates that racially-motivated attacks against Sino-Indonesians have sharply curtailed since the middle of 1998, that Indonesians are now

permitted to teach, speak, and print the Chinese language, and that Indonesia no longer bans Chinese language publications. While the Report clearly acknowledges that attacks do continue to be reported, it nonetheless constitutes substantial evidence supporting the IJ's determination that country conditions have changed, and it rebuts any possible presumption of future persecution. *See, e.g., Lukwago v. Ashcroft*, 329 F.3d 157, 174 (3d Cir. 2003).

We have considered all of the remaining arguments advanced by the parties and conclude that no further discussion is necessary. Substantial evidence in the record supports the finding that Petitioners failed to meet their burden of proof that they experienced past persecution due to their ethnicity or religion or that they would be subject to persecution on account of their ethnicity or religion if returned to Indonesia.

IV.

For the reasons set forth, we will deny the petition for review.